IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action Number 3:08cr403 |
| MARIO TERRELL DAY, | |
| Defendant. | |

## MEMORANDUM OPINION

This matter is before the Court on the defendant's motion to suppress. For the reasons stated below, the defendant's motion is granted in part and denied in part.

### I. FACTS

On July 5, 2008, Officers Costa and Slader of the American Security Group were on duty at the Regency Lake apartment complex. They are both "armed security officers" with the power to arrest pursuant to Virginia Code Section 9.1-138 *et seq*. While patrolling, the officers noticed a gathering at 6464 Planet Road. Shortly after midnight, they observed individuals later identified as Evan Moore and Mario Day, the defendant, in the middle of the road arguing with unseen individuals inside the apartment. The officers observed Day retrieve a gun from a nearby Caprice. Holding the gun at the "low and ready," Day began advancing on the apartment while continuing to shout at the individuals inside. Exiting their patrol car, the officers drew their weapons and yelled at Day to freeze as they ran towards him. Day immediately placed the gun on the floorboard of the Caprice and raised his hands. The officers placed Day in restraints and conducted a *Terry* search, wherein they found no suspicious bulges or hard objects. Nevertheless, and without giving any *Miranda* warnings, Officer Costa asked Day if he had

"anything illegal" on him. Day admitted he has a little marijuana; Officer Costa reached into Day's pants pocket and retrieved the marijuana. The officers also questioned Day about the firearm, which he said he was carrying for his safety.

The officers contacted their superior, Lieutenant Pentato, and the Chesterfield police department. Chesterfield Police Officer Neville arrived and took over custody of Day and Moore. The parties agree that Officer Neville discovered the firearm was reported stolen before questioning Day about the gun. Likewise, it is undisputed that Officer Neville failed to read Day his *Miranda* rights before questioning him about the gun and marijuana.

## II. ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures by government officials and private parties acting as governmental agents or instruments. *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602, 613-614 (1989). The degree of governmental involvement in the private individual's activities, judged under the totality of the circumstances, determines whether the governmental conduct requirement is met. *Id.* at 614. The government's mere passive acceptance or acquiescence in private conduct is insufficient to implicate Fourth Amendment protections; some type of affirmative encouragement or governmental participation is necessary. *United States* v. *Jarrett*, 338 F.3d 339, 344, 346 (4th Cir. 2003).

In analyzing this situation, we must look to Virginia Code Section 9.1-138 *et seq.*, which regulates private security services within the Commonwealth. To be an armed security officer in Virginia, one must obtain "a valid registration issued by the Department [of Criminal Justice.]" Va. Code Ann. § 9.1-139 (2006). To become a registered armed security officer, an individual must satisfy "the compulsory minimum training standards established by the [Criminal Justice

Services] Board[1]" and pass a background check of the Virginia Criminal History Records and the National Criminal Records. *Id.* § 9.1-139(F). Once registered, armed security officers remain subject to investigation and discipline by the Criminal Justice Services Board.[2] *Id.* § 9.1-141. Importantly, Virginia Code Section 9.1-146 endows these registered armed security officers with "the power to effect an arrest for an offense occurring * * * in his presence on [the] premises" wherein the officer is on duty. As such, the armed security officer "shall be considered an arresting officer" for the purposes of Virginia Code Section 19.2-74, dealing with the issuance of summonses in misdemeanor cases. *Ibid*.

To understand the implications of these statutes, it is helpful to look at the analysis of armed security officials under Section 1983, which provides redress for violations of federal or constitutional rights by those acting under color of law. See 42 U.S.C. § 1983. Although some Justices have posited that "clear[ly] * * * the delegation of police power to a private party will entail state action," see *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 172 n.8 (1978) (Stevens, J., dissenting), the Court has explicitly left open the question of "the constitutional status of private police forces," *id.* at 163 n.14. Recently, in the thoughtful and persuasive opinion of *Romanski* v. *Detroit Entertainment, L.L.C.*, 428 F.3d 629 (2005), the Sixth Circuit examined the substantial body of case law on the treatment of such officers under Section 1983. The court explained that a line has been drawn between "cases in which a private actor exercises a power traditionally reserved to the state, but not exclusively reserved to it, e.g., the common law shopkeeper's

---

1 The Criminal Justice Services Board is a policy board in the executive branch of Virginia's government. Va. Code Ann. § 9.1-108.

2 With the advisement of the Private Security Services Advisory Board, an advisory board in the executive branch of Virginia's government, see *id.* § 9.1-143, the Criminal Justice Services Board is empowered to establish the qualifications for, and examine the qualifications of, armed security officer applicants; adopt regulations to ensure the continued competency of armed security officers; receive and investigate complaints and take disciplinary action against armed security officers; and revoke, suspend, or fail to renew the registration of armed security officers. *Id.* § 9.1-141.

privilege, from cases in which a private actor exercises a power exclusively reserved to the state, e.g., the police power. Where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test."[3] *Id.* at 637. This is because "[u]nlike the common law privileges at issue in *Wade* [v. *Byles*, 83 F.3d 902 (7th Cir. 1996)] (the use of deadly force in self-defense, the right to detain for trespass, and the right to carry a weapon) and *Chapman* [v. *Higbee Co.*, 319 F.3d 825 (6th Cir. 2003) (en banc)] (the shopkeeper's privilege), which may be invoked by any citizen under appropriate circumstances, the plenary[4] arrest power enjoyed by private security police officers licensed pursuant to [Michigan law] is a power traditionally reserved to the state alone." *Id.* at 638. This delineation is logical given that "[i]t is beyond dispute that the police function is 'one of the basic functions of government' * * * [a]nd an arrest is 'the function most commonly associated with the police.'" *Rodriguez* v. *Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003)(quoting *Foley* v. *Connelie*, 435 U.S. 291, 297-298 (1978)). Moreover it accords with the Supreme Court's declaration that "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."[5] *Evans* v. *Newton*, 382 U.S. 296, 299 (1966).

---

3 Hence, assertions that defendants were a mall police officer and mall security officers involved in an alleged incident of false imprisonment and illegal search and seizure carried a Section 1983 claim through a frivolity review. *Benson* v. *Plaza Assocs., Inc.*, No. 507-cv-87, 2007 WL 2021794 (E.D.N.C. July 9, 2007).

4 "Plenary" in this situation means that while on duty at the employer's premises, a private security officer could make warrantless arrests to the same extent as public police officers: "at one's discretion and for any offenses." *Romanski*, 428 F.3d at 638 & n.3.

5 It is noteworthy that at least one million individuals are employed in private security work throughout the United States, constituting at a minimum half of the crime-related security personnel in the country. See William E. Ringel, *"Government Conduct" and Private Searches – Security Guards, Private Police, and Off-duty Police Officers*, Searches & Seizures, Arrests & Confessions §2:4 (2008). Within the past thirty-five years, private security officers have come to "vastly outnumber public law enforcement officers" – indeed, according to the Department of Labor, there were over one million private security officers and only 624,000 public officers in 2006 – with twice as much

Without limitation, the Virginia Code endows armed security officers with the power to effect arrests for any offenses occurring in an on-duty officer's presence. Va. Code Ann. §9.1-146. A similar grant of power led the Sixth Circuit to declare a security officer was, as a matter of law, a state actor. See *Romanski*, 428 F.3d at 638. This particular provision has prompted the Virginia Court of Appeals to observe that armed "[s]ecurity officers have several powers normally reserved for police officers," for "[t]hrough substantial regulation, the General Assembly has clothed [them] with many of the powers reserved for public employees or officers. Indeed, in some instances, a security officer is treated exactly like a police officer." *Coston* v. *Commonwealth*, 512 S.E.2d 158, 159 (1999).

For the purposes of our analysis, it is enough to observe that the Virginia legislature specifically granted Officers Slader and Costa the power to arrest as armed security officers. These officers were vetted, trained, and continue to be subject to disciplinary action under the aegis of the state's Criminal Justice Services Board. In this context, the state is not a mere passive participant; rather, it affirmatively encouraged and enabled these officers to engage in the complained-of conduct, for without their state-granted authority, these officers could not have acted as *de facto* police. In short, the state was the genesis of their power and activities rather than a mere passive recipient of the largess of their actions. Cf., *e.g.*, *United States* v. *Kinney*, 953 F.2d 863 (4th Cir. 1992)(officers' mere presence insufficient to turn privately initiated search into government conduct).

Clearly Officers Slader and Costa were operating as *de facto* police on the night in question. The officers were "patrolling" the area in their unmarked sedan (a car of sufficient similarity to the stereotypical image of an unmarked police car that a Chesterfield officer

---

spent on private as public security. Ric Simmons, *Private Criminal Justice*, 42 Wake Forest L. Rev. 911, 920-921 & n.34 (2007).

"assumed" it must be the security officers' vehicle); noticing a potentially disorderly gathering in their rounds, the officers returned to this area, parking where they could observe the burgeoning situation. Observing a "verbal altercation" that escalated to Day's retrieval of a gun from a nearby car, the officers exited their vehicle, drawing their weapons and yelling "freeze" as they ran towards Day. Both officers were wearing black uniforms with gold emblems on the sleeves, displaying a gold badge virtually identical to a police shield, and bearing handguns; in short, they were the quintessential image of law enforcement as they ran with weapons drawn towards Day. The officers placed Day in restraints, "terried" him, and began questioning him about the gun and whether he had "anything illegal" on his person. Clearly the officers acted with the intent of deterring crime and assisting law enforcement.[6] Compare *Jarrett*, 338 F.3d 339 (hacker conducted searches aimed at child pornographers to assist law enforcement), with *Kinney*, 953 F.2d 863 (girlfriend opened locked closet to show guns with which boyfriend had threatened her to the police she had summonsed to their apartment).

Therefore, the Court finds that Officers Slader and Costa were acting as governmental agents in their interactions with Day. As such, the Court must consider whether Day's Fourth Amendment rights were violated by these officers.

An investigative detention or stop is constitutional if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid* v. *Georgia*, 448 U.S. 438, 440 (1980). Moreover, where an officer observes unusual conduct that reasonably leads him to conclude that criminal activity might be afoot and that the people with whom he is dealing might be armed and dangerous, the officer is entitled to conduct a carefully

---

6 The styling of the officers' incident report further supports their purpose in acting as *de facto* police, containing as it does the following form questions: Number of Victims ___; Number of Witnesses___; Number of Subjects ____; Arrest made: YES/NO; Released on Summons: YES/NO; Summons #___; VA Code ___ or County Ordinance ___; Charges:___.

circumscribed search of the outer clothing of such individuals in order to discover weapons that could be used against him. *Terry* v. *Ohio*, 392 U.S. 1 (1968). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Such a detention does not require probable cause, but it does require something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27.

In determining whether reasonable suspicion exists, a court must consider "the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." *United States* v. *Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). Here, the officers had observed an escalating verbal altercation between Day, Moore, and an unknown number of individuals within the apartment. They saw Day retrieve a handgun from a nearby car and begin approaching the apartment, holding the gun at the "low and ready" while continuing to yell at the unseen inhabitants. The officers testified that a gun is held at the "low and ready" for ease of use and/or self-defense. This was clearly a volatile situation with at least one armed and potentially dangerous individual, notwithstanding the fact that Day immediately complied with the officers' instructions to drop the gun. The gun was on the floorboard of the car, in plain view of the officers through the open car door as they approached Day, who was standing next to the vehicle. To ensure their safety and that of bystanders, the officers were justified in conducting the pat-down of Day's clothing in an attempt to discern whether he had more weapons on his person. The seizure of the plainly visible gun was likewise justified.

However, Officer Costa admits that he found nothing indicative of either a weapon or contraband in conducting this pat-down. The Supreme Court has held that "[i]f the protective

search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota* v. *Dickerson*, 508 U.S. 366, 373 (1993). Hence, Officer Costa's subsequent retrieval of the marijuana from Day's pants pocket cannot be justified as deriving from the *Terry* search.

This brings us to the issue of whether Day's Fifth Amendment rights were violated by improper official questioning. Custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). The determination of whether a defendant is in custody is "objective" and focuses on "how a reasonable man in the suspect's position would have understood his situation." *Davis* v. *Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (quoting *Berkemer* v. *McCarty,* 468 U.S. 420, 442 (1984)). Relevant factors for determining whether an individual is in custody include "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and defendant." *United States* v. *Weaver*, 282 F.3d 302, 312 (4th Cir. 2002). In this case, the officers were holding Day at gunpoint, had ordered him to freeze as they ran towards him, had placed him in handcuffs, and had conducted a *Terry* search of his person. Therefore, Day was in custody.

Interrogation encompasses both "express questioning" and any activity by officers "reasonably likely to elicit an incriminating response." *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). There is a narrow public safety exception to the prophylactic requirement of giving *Miranda* warnings, but only for "questions necessary to secure [the officers'] safety or the safety of the public" rather than questions designed to "elicit testimonial evidence from a suspect."

8

*New York* v. *Quarles*, 467 U.S. 649, 659 (1984). Such questions must relate "to an objectively reasonable need to protect the police or public from an[] immediate danger associated with [a] weapon." *Id.* at 659 n.8. The prototypical example would be the location of possible weapons in a volatile situation. See, *e.g.*, *United States* v. *Young*, 58 Fed. Appx. 980 (4th Cir. 2003) (unreported).

The public safety exception is inapplicable in this case. The officers had secured the firearm and conducted a fruitless *Terry* search before they began questioning Day about the firearm; at this point, there was no objectively reasonable need to protect anyone from an immediate danger associated with a weapon. Moreover, the officers' questions were impermissibly designed to elicit testimonial information (*e.g.*, why Day possessed the gun). Therefore, any statements about the firearm must be suppressed.

Similarly Day's statements about the marijuana must be suppressed. It is hard to envision a question more likely to "elicit an incriminating response" than Officer Costa's query of whether Day had "anything illegal" on him. Having already conducted a fruitless *Terry* search, the officers could not get a second bite at the apple by engaging in custodial interrogation without issuing a *Miranda* warning.

The government has conceded that Officer Neville engaged in custodial interrogation without advising Day of his *Miranda* rights. To ensure utmost clarity for the parties, however, the Court notes that since Neville learned the firearm was reported stolen prior to engaging in this interrogation, any gun-related questions were necessarily likely to elicit incriminating responses. Therefore, any statements Day made to Neville about either the marijuana or the gun must be suppressed.

### III. CONCLUSION

For the aforementioned reasons, Day's motion to suppress will be denied as to the firearm, but will be granted as to the marijuana and to all statements about the firearm or marijuana.

An appropriate Order shall issue.

<u>December 1, 2008</u>              /s/
DATE                     RICHARD L. WILLIAMS
                   SENIOR UNITED STATES DISTRICT JUDGE